UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
THE MARCUS CORPORATION, :
on behalf of itself and all similarly situated persons, :
: 04 Civ. 05432 (GBD)
                               Plaintiff, :
:
          - against - :
:
AMERICAN EXPRESS COMPANY and :
AMERICAN EXPRESS TRAVEL RELATED :
SERVICES COMPANY, INC., :
:
                              Defendants. :
---------------------------------------------------------------x


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
AND TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)**


**FRIEDMAN LAW GROUP LLP**
    Gary B. Friedman
    Tracey Kitzman
    Scott Levy
    Rebecca Quinn
    270 Lafayette Street
    New York, New York 10012
    (212) 680-5150

**PATTON BOGGS LLP**
    Read K. McCaffrey
    2550 M Street, NW
    Washington, DC 20037
    (202) 457-6000

**REINHARDT WENDORF & BLANCHFIELD**
    Mark Reinhardt
    Mark A. Wendorf
    1250 East First National Bank Building
    332 Minnesota Street
    St. Paul, MN 55101
    (651) 287-2100

Plaintiff The Marcus Corporation ("Marcus Corp.") submits this memorandum in support of its motion seeking Orders of this Court (1) preliminarily approving the settlement of this class action, including certifying a class for settlement purposes; and (2) transferring this case to Judge Garaufis in the Eastern District of New York to allow for unitary settlement approval proceedings of all merchant class claims that are subject to the Definitive Class Settlement Agreement annexed hereto as Exhibit A, including the cases that have been consolidated in *In Re American Express Anti-Steering Rules Antitrust Litig.*, MDL 2221 (EDNY) (NGG) (RER). For the convenience of the Court, proposed Orders granting preliminary approval and transfer of this action are annexed hereto as Exhibits B and C.

Subsequent to transfer, plaintiffs will seek an Order in the Eastern District of New York: (i) certifying a unified injunctive class under Fed. R. Civ. P. 23(b)(2); (ii) approving a single unitary plan for notifying class members of the settlement and the opportunity to file objections in a single Court; (iii) awarding attorneys' fees and costs, covering all proceedings that are subject to the Settlement Agreement and related activities of counsel; and (iv) granting final approval of all terms embodied in the Definitive Class Settlement Agreement.

**PRELIMINARY STATEMENT**

The injunction that lies at the heart of this proposed settlement represents some of the most consequential relief ever obtained in a private enforcement action under the U.S. antitrust laws. The injunction builds on the equitable relief obtained recently in merchant class cases against Visa and MasterCard, and provides merchants – for the first time ever – readily usable market-based tools for reversing the ever-escalating costs of payment card acceptance. Coming as it does on the heels of more than ten years of hard-fought litigation in numerous courts, and

following protracted negotiations facilitated by one of the nation's most respected mediators, the settlement easily satisfies the standards governing preliminary approval.

The core relief is strikingly simple: American Express's rules will be altered to permit merchants to impose a separate fee, or "surcharge," on credit and charge card transactions (which are expensive to merchants) and thus to steer transactions to debit cards (which are generally inexpensive to merchants, and which are not subject to any surcharge). And the agreement prohibits Amex from undermining that core relief in various ways, including through tying arrangements that might otherwise compel merchants to accept high-fee, non-surchargeable Amex-branded debit cards as a condition of accepting Amex's personal and corporate charge and credit cards.

But while the relief is simple, the implications for merchants and their customers are sweeping. In the U.S. alone, several trillion dollars each year are pumped through the pipes of the payment card networks, including Visa, MasterCard and defendant American Express. For decades, these networks have used their extraordinary market power to exact massive tolls on that traffic, in the form of merchant fees that are possibly the highest in the industrialized world. And merchants have been largely powerless to resist, incurring roughly $70 billion each year in fees to the networks and their agents.

Now, following approval of this settlement, merchants will have at their disposal a tool of unprecedented potency to constrain those costs: surcharges in favor of debit. The signature feature of the U.S. payment market today is the enormous spread between the low cost of debit acceptance – where rates are largely regulated by the Federal Reserve, under the Durbin Amendment to the Dodd-Frank financial reforms– and the high cost of credit and charge card acceptance. On a $100 ticket, the typical U.S. retailer might pay $2.75 in merchant fees for a

credit card transaction while incurring roughly 75 cents for a debit card.  Merchants will now have the option of imposing a simple, single surcharge – say, 2% of the ticket amount – on all credit card transactions, while advertising that debit (and cash and checks) are accepted free of charge.  By availing themselves of this new market-based tool, merchants can effectively counter the otherwise unchecked power of the credit card networks.

The entire point behind the *Marcus* case was to give merchants a competitive tool for combating card acceptance costs.  Plaintiff Marcus Corp. and the parallel *Italian Colors* plaintiffs (discussed below) argued that certain applications of American Express's Honor All Cards rule harmed competition by allowing Amex to offer inflated fees to prospective bank-issuers of Amex-branded revolving credit cards, thus causing Visa and MasterCard to increase the merchant fees from which they compensate banks, and generally inciting an ever-escalating upward spiral in merchant interchange fees.  This was always the competitive harm at the heart of the *Marcus* lawsuit, from the July 13, 2004 complaint, at ¶¶ 41-42, through its November 8, 2008 summary judgment opposition brief, at 22-24.  Indeed, in its Memorandum Opinion denying Amex's statute of limitations motion, this Court recognized plaintiff's contention that American Express's tying arrangement worked a "radical realignment" of the market by "forcing MasterCard and Visa to either price their own services to merchants at inefficiently high levels, or risk losing all of the banks, and the U.S. credit card market, to American Express." 2005 U.S. Dist. Lexis 13170, at 7-8, 11.

The harm that animated *Marcus* is the harm remedied in the proposed settlement.  If credit card companies maintain "inefficiently high levels" of fees on credit and charge cards, merchants will now be able to use surcharges to steer transactions to much cheaper debit products.  Currently, debit accounts for less than half of plastic payment volume in the United

States. By contrast, in much of Europe, debit accounts for roughly 80% of plastic spend. So debit plainly has a lot of room to grow in the U.S. market. And as merchants use their new competitive tool to shift payments over to debit, their overall payment acceptance costs will plummet. Further, as consumers modify habits and move debit cards to the front of their wallets, displacing credit and charge cards, that will benefit even the merchants who do not use their new-found surcharging tool. As Judge Gleeson recognized last week in approving the merchant class settlement with Visa and MasterCard, the "ability to surcharge allows merchants … to steer customers to less costly cards or to other payment mechanisms, decreasing their card-acceptance costs." MDL 1720 Approval Order at 33.[1]

And all of this benefits consumers. As Judge Gleeson further observed, rules against surcharging are blatantly "anti-consumer." MDL 1720 Approval Order at 34. Without the ability to surcharge, merchants seeking to cover their high acceptance costs -- which fund the card issuers' extravagant rewards programs -- must raise prices to all consumers, including users of cash, debit and even food stamps. Rules against surcharging thus create "a regime in which the poorest consumers subsidize the awards conferred upon premium cardholders." *Id.* at 36. The removal of these rules means that, "[f]or the first time, merchants will be empowered to expose hidden bank fees to their customers, educate them about those fees, and use that information to influence their customers' choices of payment methods." *Id.* at 10. Likewise, in *Expressions Hair Design v. Schneiderman*, 2013 WL 5477607 at *14 (S.D.N.Y. Oct. 3, 2013) (JSR), Judge Rakoff struck down a state ban on surcharges, observing that such bans "were enacted in the name of consumer protection at the behest of the credit-card industry over the objection of consumer

---

[1] *In re Payment Card Interchange And Merchant Discount Fee Antitrust Litig.*, 05-MD-1720 (EDNY) (JG) (JO) ("MDL 1720"). References to the "MDL 1720 Approval Order" refer to the December 13, 2013 order granting final approval of that settlement, available on ECF at 1:05-md-01720-JG-JO, DE - 6124

advocates." Indeed, in that case, the nation's leading consumer advocacy groups went on record sharply attacking the anti-surcharging restraints. (Available on ECF at 1:13-cv-3775-JSR, DE-25.)

Critically, while this litigation was directed at American Express, the relief contained in this settlement will empower merchants to surcharge Visa, MasterCard and Discover credit card transactions. This settlement unlocks the value of the rules changes that merchants have wrung from all of those networks in recent years. Under the MDL 1720 settlement, merchants surcharging Visa or MasterCard must also surcharge American Express. Discover rules are generally similar. So while all three of the other networks now *allow* for surcharging, merchants who accept American Express – a group that accounts for over 90% of U.S. payment card transaction volume -- are realistically constrained by Amex's refusal to allow the practice. Put simply, until and unless American Express allows merchants to surcharge Amex transactions, the vast majority of U.S. merchants cannot surcharge *any* transactions.

Thus, in the MDL 1720 approval process, many merchants complained that they cannot avail themselves of the historic injunctive relief obtained in that case because they cannot surcharge Amex transactions. MDL 1720 Approval Order at 12 (noting objections that "the merchant restraints imposed by American Express" serve to "undermine" the relief). In response, Judge Gleeson wrote, "even if the objectors are right in contending that additional dominoes must fall before the alleged anticompetitive behavior of Visa and MasterCard is eradicated, those dominoes will have to fall in other forums." *Id*. at 13.

With the Settlement Agreement filed today, the dominoes are falling.

## FACTUAL BACKGROUND

    A.    *Procedural History*

In August 2003, a group of small merchants including Italian Colors Restaurant filed suit in the Northern District of California challenging certain applications of American Express's Honor All Cards rule under the antitrust laws. Those actions were then transferred to this Court, *Italian Colors Rest. v. Am. Express Co.*, 2003 WL 22682482 (N.D. Cal. Nov. 7, 2003), where other similar cases were soon filed and consolidated under the caption *In Re American Express Merchants Litig.*, Master File No. 03-cv-9592 (the "*Italian Colors* cases"). The undersigned counsel were appointed as interim class counsel under Fed. R. Civ. P. 23(g) on December 14, 2004. (DE-29).

The plaintiffs in the *Italian Colors* cases – like all small merchants subject to the standard form American Express card acceptance agreement during that time frame – were bound by arbitration clauses banning collective action and mandating one-on-one arbitral proceedings. On April 30, 2004, American Express moved to compel arbitration in the *Italian Colors* cases, and, on March 16, 2006, the Court granted that motion. (DE-20 and DE-34).

On July 13, 2004, the instant class action was filed by The Marcus Corporation. *The Marcus Corp. v. American Express Co. et al.*, 04-cv-05432 (GBD) (SDNY). Unlike the smaller merchant plaintiffs in the *Italian Colors* cases*,* Marcus Corp. was not subject to any arbitration provision. Accordingly, *Marcus* proceeded with discovery as the *Italian Colors* plaintiffs commenced their lengthy appellate journey challenging American Express's arbitration policy.

Over the course of the ensuing five years, the parties in *Marcus* engaged in exceedingly hard-fought litigation. The litigation record included millions of pages produced by American Express and millions more produced by third-parties, including the complete record from *In re*

*VisaCheck / MasterMoney Antitrust Litigation*, 96-cv-5238 (JG) (EDNY), which resulted in Visa and MasterCard reforming their Honor All Cards rules to untie debit card acceptance from credit card acceptance.  There was substantial deposition discovery of American Express, Marcus Corp. and third parties, in addition to which plaintiff requisitioned and reviewed depositions of approximately seventy witnesses from the *American Express Travel Related Services, Inc. v. Visa USA Inc. et al.*, 04-cv-08967 (BSJ) (SDNY) litigation, which was proceeding contemporaneously with discovery here, and which obviated scores of additional fact depositions in this case.  In addition to discovery motions, the parties fully briefed and argued multiple substantive motions, including motions to dismiss on statute of limitations grounds, and a class certification motion following multiple expert depositions and reports.  Further, after an exchange of extensive expert reports on merits and damages issues, and multiple *Daubert* motions by the defendants (all of which were denied), both sides moved for summary judgment, and both of those motions were fully briefed and argued in January 2009.

Also in January 2009, the Second Circuit issued the first of a series of decisions finding that the collective action waiver contained in the American Express arbitration clause was unenforceable against the *Italian Colors* plaintiffs.  *In re American Express Merchants Litig.*, 554 F.3d 300 (January 30, 2009).  In the ensuing years, the parties engaged in two additional rounds of briefing at the Second Circuit following Supreme Court rulings in arbitration-related cases.  The Second Circuit reaffirmed its original ruling both times. *In re American Express Merchants Litig.*, 634 F.3d 187 (March 8, 2011); *In re American Express Merchants Litig*, 667 F.3d 204 (February 1, 2012).  American Express successfully petitioned the Supreme Court for certiorari, and, on June 20, 2013, the Court reversed the Second Circuit's decision in *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304.

7

B.     *Anti-Steering Rules Challenges*

During the course of discovery in the *Marcus* case, it became apparent to Class Counsel and their economic experts that the rules circumscribing the ability of merchants to steer transactions to lower-cost payment forms were at the root of the competitive ills plaguing the payments industry. Based on the evidence uncovered, plaintiff's merits expert in this action, Prof. David Sibley, concluded that American Express's rules against steering operated to largely insulate it from price competitive pricing pressures, and warranted a finding of substantial market power.

In May 2005, Animal Land Inc., a pet transportation business based in Atlanta, represented by the same counsel as in *Marcus*, filed an action against Visa entitled *Animal Land, Inc. v. Visa USA, Inc.*, 05-CV-01210 (JOF) (N.D. Ga.) challenging Visa's rules against surcharging. That action -- which was followed in short order by cases challenging MasterCard's similar rule and cases that challenged the so-called "default interchange rules" of both networks -- was the first case filed in what later became MDL 1720.

But as litigation challenging anti-steering and anti-surcharging rules broke out in 2005-06, Marcus Corp. was not at liberty to amend its complaint to challenge American Express's similar rule in this action.[2]  So instead, Class Counsel filed cases challenging American Express's rules restraining merchant surcharges in the MDL 1720 court, on behalf of other small merchant clients. After conferring with American Express, the parties in MDL 1720 and Magistrate Judge Orenstein, Class Counsel then withdrew those actions and re-filed them in this

---

[2] By early 2006, subsequent to a significant asset divestiture, Marcus Corp. had become subject to the standard form American Express card acceptance agreement applicable to smaller merchants, thus obligating it to arbitrate any new claims. By informal agreement of the parties, defendants did not seek to enforce the arbitration agreement as to the claims in this action, and Marcus Corp. did not seek to amend its complaint to add the anti-steering rules claims in this action.

8

Court, where they were ultimately reassigned to Judge Pauley under the master file name *Performance Labs, Inc. et al. v. American Express Co., et al.,* 06-CV-2974 (WHP) (S.D.N.Y.) and then consolidated with additional filings as *In re American Express Anti-Steering Rules Antitrust Litig.*, 06-CV-2974 (WHP) (S.D.N.Y) ("*Amex ASR*").

Because the merchants challenging Amex's anti-steering rules were all subject to the arbitration clause, the *Amex ASR* case was stayed from its inception in 2006 until the Second Circuit ruled in *Italian Colors* in January 2009. At that point, the parties commenced discovery before Judge Pauley. Also, in that time frame, a number of larger merchants (who were either not bound by Amex's arbitration clause or as to whom Amex has not invoked that clause) filed claims that were substantially identical to the *Amex ASR* complaint in the Eastern District of New York, where they were assigned to Judge Garaufis. *Rite Aid Corp., et al. v. American Express Travel Related Services, et al.*, Master File No. 08-CV-2315 (NGG) (E.D.N.Y.) Collectively, these plaintiffs are referred to as the Individual Merchant Plaintiffs.

In October 2009, relying on evidence adduced in this action, counsel for Marcus Corp. and the *Amex ASR* plaintiffs submitted to the Justice Department – whom it understood was investigating Visa and MasterCard's rules relating to merchant steering -- a white paper entitled "Why The Antitrust Division Should Challenge American Express's Anti-Steering Rules." Following extensive investigation, the Justice Department announced on October 4, 2010 that it had entered into consent decrees with Visa and MasterCard and filed an enforcement action against American Express challenging certain of its rules relating to merchant steering. *United States v. American Express Co.,* 10-CV-4496 (NGG) (E.D.N.Y.). Because both the DOJ's case and the Rite Aid cases were pending in the Eastern District of New York, the *Amex ASR*

9

plaintiffs initiated proceedings before the Judicial Panel on Multi-District Litigation, which then transferred the *Amex ASR* case to Judge Garaufis.

Discovery in the *Amex ASR* case was extensive, to say the least. In coordination with the Department of Justice and the Individual Merchant Plaintiffs, the class plaintiffs participated in 150 depositions and marshaled a record that included more than 20 million pages of new documents. Class plaintiffs' investigation of surcharge related issues was particularly thorough, including numerous depositions of witnesses responsible for American Express's operations in Australia, where surcharging has been permitted since 2003.

    C.    *Settlement Process*

Back in the fall of 2006, after this Court had granted the motion to compel arbitration in *Italian Colors* and before the initial Second Circuit decision, with discovery in *Marcus* in full swing, the parties engaged in a series of meetings designed to explore potential resolution of the *Marcus* litigation and the recently filed challenge to Amex's anti-steering rules. The meetings did not bear fruit, and the parties agreed to resume the conversation after the arbitration issue was finally resolved. No one could have anticipated that juncture would not arrive for seven more years.

The Supreme Court's June 2013 ruling in *Italian Colors* precipitated the instant settlement. The Court's broad ruling upholding Amex's collective action waiver made it clear to Class Counsel that no damages class action was realistically feasible in *Marcus*. By 2013, class plaintiffs had discovered that virtually every Amex-accepting merchant in the U.S. was subject to a binding arbitration clause with American Express. So even if Marcus Corp. itself arguably remains free to proceed in court with the claims that are the subject of the *Marcus* case (see footnote 2 above), it is likely the courts would regard that Amex's arbitration clause is

10

enforceable as against substantially all of the members of a putative class. It was Class Counsel's judgment that even the numerosity requirement of Rule 23(a) would likely not be satisfied if *Marcus* were to proceed with a damages class.

However, it was also Class Counsel's judgment that a class action seeking market-wide injunctive relief remained viable, under *Italian Colors*, to the extent such an injunction was necessary to provide plaintiffs meaningful relief under the antitrust laws. On that basis, class plaintiffs vigorously resisted Amex's motion to compel arbitration in the *Amex ASR* case. That matter was fully briefed in August 2013, and is currently *sub judice* before Judge Garaufis (DEs 262-269).

It is against this backdrop that the parties have agreed to settle the instant litigation. If plaintiffs were to lose the current arbitration motion pending before Judge Garaufis, then it is quite likely that no private actor could obtain any relief – including the right to impose surcharges -- for the 99% of U.S. merchants that are unable or unlikely to press their claim in one-on-one arbitrations. Accordingly, the parties engaged in intensive negotiations throughout the summer and fall of 2013, with the assistance of mediator Kenneth R. Feinberg. Mr. Feinberg presided over numerous in-person and telephonic conferences, commencing even before the Supreme Court released its *Italian Colors* ruling, and continuing to the present. At the final approval hearing on this application, Class Counsel expects to submit a declaration from Mr. Feinberg attesting to the hard-fought and decidedly arms-length nature of these negotiations.

D.   *Settlement Terms*

The Settlement Agreement allows merchants to impose a surcharge upon Amex credit and charge card transactions so long as: (i) the amount of the surcharge does not exceed the discount rate applicable to that transaction and the amount of the surcharge the merchant is

permitted to impose on any other credit card brand; (ii) the surcharge is fully disclosed, on the same terms that the merchant is required to disclose Visa and MasterCard surcharges; and (iii) the merchant provides 30 days notice to American Express that it intends to surcharge.  SA ¶ 8. Debit cards, including pre-paid or gift cards, may not be surcharged unless or until similar cards on competitors' brands are subject to surcharging.  SA ¶ 8.  Meanwhile, American Express is prohibited from offering a traditional debit card subject to its Honor All Cards policy, lest such an offering undermine the surcharging relief provided in the agreement. SA ¶ 8.

The agreement also provides that American Express and a merchant may agree to waive the right to surcharge, provided that the contract is individually negotiated, for a set term of years and supported by actual consideration, *e.g*., a discount rate reduction.  SA ¶ 10. An obligation of good faith and fair dealing is expressly made applicable to any such contracts, SA ¶ 90, to ensure (as just one example) that Amex cannot threaten merchants with rate increases to induce them to enter agreements not to surcharge.

The release is a broad one, "specifically intended . . . to preclude all members of the Settlement Class from seeking . . . equitable relief prior to the Release Termination Date (which date shall be a minimum of ten years following the Provisions Change Date) with respect to any rule or provision that was or could have been challenged in these Actions" subject to the "identical factual predicate doctrine as applied to the [*Amex ASR* case] and the Marcus Action." SA ¶ 26.  The release duration may also extend beyond ten years if Visa and MasterCard's rules remain unchanged, as well as Amex's rules, and so long as the equitable release in the MDL 1720 agreement remains in effect and has not been abrogated.  SA ¶ 26.

There is no release whatsoever of any right that any class member presently has to sue for money damages. SA ¶ 40.  On the contrary, the Agreement specifically contemplates that a

merchant may pursue damages claims against American Express based on the anti-steering rules and Honor All Cards rules (as those rules exist before the rules changes take effect) under whatever dispute resolution terms are applicable to that merchant. SA ¶ 40. Only claims for damages based on the relevant rules as they exist *after* approval of the settlement agreement are released (and even then, only to the extent Amex has not engaged in any new conduct). SA ¶ 27. Recognizing that most merchants' agreements call for binding arbitration, the agreement provides that arbitral claimants shall be entitled to receive the extensive evidentiary and litigation record that Class Counsel has amassed in these cases. SA ¶ 68.

The Settlement Agreement also recognizes that the Department of Justice is pursuing the elimination of American Express's "non-discrimination rules," or anti-steering rules, and it ensures that class members will receive the full benefit of whatever relief DOJ is able to obtain from American Express after trial or via a consent decree. SA ¶ 35.

In addition, American Express has agreed to pay the attorneys' fees and costs incurred by Class Counsel and the dozens of law firms whose efforts over the past decade have made this settlement possible, up to a cap of $75 million. SA ¶ 55. It will also pay $2 million in costs associated with the provision of notice to the members of the settlement class, SA ¶ 17, and an additional $2 million as a fund "to be used solely by Class Counsel for the purpose of educating members of the Settlement Class about" their new-found surcharging rights. SA ¶ 18.

**ARGUMENT**

I. **PRELIMINARY APPROVAL IS WARRANTED**

The settlement of complex litigation is strongly favored. The Second Circuit is "mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The

compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) (internal quotation marks and citation omitted); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995) ("It is well established that there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.").

Accordingly, at the preliminary approval stage, courts ask only whether the proposed settlement was the product of collusion and whether it is within the range of possible reasonableness: "Where the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval is granted." *In re Initial Pub. Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). It is well established that "a full fairness analysis is unnecessary at this stage; preliminary approval is appropriate where a proposed settlement is merely within the range of possible approval." *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

Measured against these standards, the proposed settlement easily warrants preliminary approval. At the final approval hearing, Class Counsel will present detailed economic evidence to demonstrate that the relief here represents "an indisputably procompetitive development that has the potential to alter the very core of the problem this lawsuit was brought to challenge." MDL 1720 Approval Order at 31. For now, though, it is enough to say that this settlement is within the "range of possible approval," with respect to the fairness of the settlement and adequacy of consideration. Surely it is that.

The procedural fairness of the settlement is likewise plain. The Second Circuit in *Wal-Mart* held that a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." 396 F.3d at 116 (quoting Manual For Complex Litig. (Third) at § 30.42 (1995)); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-cv-8144 (CM), 2009 WL 5178546, at *4 (S.D.N.Y. Dec. 23, 2009) (same). Here, after nearly eleven years of hard-fought litigation, 190 depositions across the combined cases, discovery including 20 million pages or more, and many months of intensive negotiations facilitated by a leading mediator, the presumption of fairness is surely warranted.

It is also clearly appropriate here to certify an injunctive class for settlement purposes only, as the proposed Preliminary Approval Order would do. A Rule 23(b)(2) class is warranted when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Applying this standard, Judge Gleeson held in MDL 1720 that "[t]he network rules regimes that gave rise to this case applied generally to every merchant accepting Visa or MasterCard credit cards, and the injunctive relief in the proposed settlement does as well. Specifically, all merchants have the same interest in being able to inform cardholders at the point of sale of the acceptance costs of their credit cards and to either steer them to lower-cost alternatives or recoup the cost of acceptance." MDL 1720 Approval Order at 46. The same is true here: the interests of all class members are aligned, and the proposed Rule 23(b)(2) class warrants certification.

Finally, the proposed Preliminary Approval Order includes an Order directing that, until Judge Garaufis takes up the application for preliminary approval (currently scheduled for

January 14, 2014), class members shall be enjoined from initiating new claims with respect to the subject matter of the instant case. The purpose of such an injunction – which is a common feature of class action settlements -- is to ensure that challenges to the release and other terms will be heard by the district court presiding over the settlement process, and not subject to collateral attack in far-flung jurisdictions by persons seeking to hold up the settling parties.

## II.     TRANSFER IS APPROPRIATE UNDER 28 U.S.C. § 1404(a)

The settlement of the *Marcus* and *Amex ASR* cases is unitary. The class is identical in the two cases. The relief that forms the consideration for the releases and covenants not to sue is identical in the two cases, and it is indivisible. An approval process that meaningfully advises class members of their rights requires a single, unitary class settlement notice that provides merchants with a single and simple-to-exercise opportunity to object. And merchants should have the right to object on the basis that the unitary injunctive relief is somehow inadequate consideration for releases of the claims in both *Marcus* and *Amex ASR*, taken together. It is difficult to understand how that objection could possibly be made in the absence of a unified settlement proceeding.

For all these reasons, and to avoid duplication of effort and expense and the potential for conflicting rulings, plaintiff Marcus Corp. respectfully submits that this Court should exercise its sound discretion to transfer this case to Judge Garaufis for consolidation or coordination with the *Amex ASR* litigation. See *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) ("[d]istrict courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis"); *Martignago v. Merrill Lynch & Co.*, 2012 U.S. Dist. LEXIS 4365, 7, 2012 WL 112246

(S.D.N.Y. Jan. 13, 2012) ("A motion to transfer pursuant to 1404(a) rests within the sound discretion of the district court") (internal quotations and citations omitted).

Dated: December 19, 2013

                                            **FRIEDMAN LAW GROUP, LLP**

                                            /s/Gary B. Friedman_____
                                            Gary B. Friedman
                                            Tracey Kitzman
                                            Scott Levy
                                            Rebecca Quinn
                                            270 Lafayette Street
                                            New York, New York 10012
                                            (212) 680-5150
                                            gfriedman@flgllp.com

Mark Reinhardt, Esq.
Mark Wendorf, Esq.
**REINHARDT WENDORF & BLANCHFIELD**
332 Minnesota Street
St. Paul, Minnesota 55101
(651) 297-2100

Read K. McCaffrey, Esq.
**PATTON BOGGS LLP**
2550 M Street, NW
Washington, DC 20037
(202) 457-6000